**This order is SIGNED.**

**Dated: October 29, 2021**



KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*slo*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number: 18-26080 |
| CASEY FORD, | Chapter 7 |
| Debtor. | |
| CAPRICE CAPITAL, LLC and HAWLEY HOCK HOLDINGS, LLC, | Adversary Proceeding No. 18-02155 |
| Plaintiffs, | Hon. Kevin R. Anderson |
| vs. | |
| CASEY FORD, | |
| Defendant. | |

**MEMORANDUM DECISION**

In *Great Expectations* Charles Dickens wrote: "Take nothing on its looks; take everything on evidence. There's no better rule."[1] The Court agrees that while the "looks" of this case are troubling, the evidence is wanting.

This proceeding involves a retired widow who was introduced to the debtor through her attorney. After an initial meeting, she agreed to loan $425,000 to the debtor's used-car dealership

---

[1] *In re Piontek*, 346 B.R. 126, 130 (Bankr. W.D. Pa. 2006) (quoting Charles Dickens' *Great Expectations*).

in hopes of sufficient profits to fund her retirement years. The terms of the loan and its repayment were ineffectually documented. About a year later, the dealership was defunct, the profits were unrealized, and the widow's loan was unpaid. She now seeks a determination from the Bankruptcy Court that her claim against the debtor is nondischargeable. Unfortunately for the plaintiff, and despite the optics of this case, the evidence presented at trial—and particularly the evidence of the debtor's intent to deceive—is insufficient to establish nondischargeability under 11 U.S.C. §§ 523(a)(2)(A) or (a)(6).[2]

## I.      JURISDICTION, NOTICE, AND VENUE

The Court's jurisdiction over this adversary proceeding is properly invoked under 28 U.S.C. § 1334(b) and § 157(a) and (b)(2).[3] This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (I) because the complaint objects to the discharge of a debt. Venue is appropriately laid in this District under 28 U.S.C. § 1409.

## II.      PROCEDURAL BACKGROUND

On August 16, 2018, Casey Ford filed a voluntary Chapter 7 bankruptcy petition (the "Debtor"). The case trustee ultimately filed a Report of No Distribution.[4] On November 16, 2018, Caprice Capital, LLC and Hawley Hock Holdings, LLC ("Plaintiffs") filed a nondischargeability complaint against the Debtor alleging false pretenses, false representation, or actual fraud under 11 U.S.C. § 523(a)(2)(A) and willful and malicious injury under § 523(a)(6).[5]

On August 25-26, 2021, the Court held a trial in the adversary proceeding. Kurt W. Laird appeared on behalf of the Plaintiffs. David R. Williams appeared on behalf of the Debtor. At the

---

[2] All statutory references are to Title 11 of the United States Code unless otherwise specified.

[3] In their Pretrial Order, the parties consented to entry of a final judgment or order by the bankruptcy judge and stated that the jurisdiction of the bankruptcy court is not disputed. Adv. No. 18-02155, ECF No. 37.

[4] Case No. 18-26080. Report filed as ECF Entry dated 09/21/2018.

[5] Adv. No. 18-02155, ECF No. 1.

close of Plaintiffs' case in chief, the Debtor brought an oral motion for judgment on partial findings under Fed. R. Bankr. P. 7052(c). The Court heard argument from both parties on the motion, made findings of fact and conclusions of law on the record, and denied the motion. At the conclusion of the trial on August 26, 2021, the Court took the matter under advisement.

Having carefully considered the parties' oral and written arguments, the evidence and testimony admitted at trial, and having conducted its own independent research of the relevant caselaw, the Court issues the following Memorandum Decision.[6]

## III.    FINDINGS OF FACT

The findings of fact set forth herein constitute the Court's findings based on the material, uncontroverted facts set forth in the Pretrial Order,[7] and the testimony and exhibits admitted at trial.

### A.    The Parties

The Plaintiffs, Caprice Capital, LLC and Hawley Hock Holdings, LLC, are limited liability companies. Sherrie Hawley ("Hawley") is an individual residing in Farmington, Utah. Hawley is the sole owner and member of the Plaintiffs.[8] The Court will hereafter refer to Hawley as the plaintiff in this case. Due to medical issues, Hawley retired in 2009. Prior to the fall of 2015, Hawley received a substantial inheritance and was looking for investment opportunities to fund

---

[6] This decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052. Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any of the conclusions of law herein are similarly deemed to be findings of fact, and they shall be equally binding as both.

[7] ECF No. 37, Pretrial Order. The Court incorporates the parties' Uncontroverted Findings of Fact set forth in the Pretrial Order.

[8] ECF No. 37, Pretrial Order at ¶ a-b.

her retirement.[9] Hawley created her Plaintiff business entities as vehicles to invest her inheritance.[10]

The Debtor, Casey Ford, is an individual who resides in Davis County, Utah.[11] In the fall of 2015, the Debtor was an owner or member of various businesses,[12] including:

a.      Car Snobs LLC ("Car Snobs") that operated a used-car lot consisting of five to seven spaces to sell high-end, used cars.

b.      Generic Resources LLC ("Generic Resources") that engaged in hard-money construction lending.

c.      His and Hers Enterprises, LLC ("His & Hers") that the Debtor used for purchases relating to his various entities using a credit card in its name.

d.      Polished Image of Utah, Inc. ("Polished Image") that provided car detailing services.

e.      Polished Image of Bountiful, LLC.

f.      Tint and Vinyl City of Utah LLC.[13]

The Debtor purchased Car Snobs in 2010. Car Snobs was a high-end, used-car dealership with a lot in Murray, Utah that could only show five to seven cars at a time.[14] At some point prior to 2015, Polished Image, one of the Debtor's corporations, became the owner of Car Snobs. The Debtor testified that Car Snobs was profitable from 2010-2015.[15]

---

[9] ECF No. 37, Pretrial Order at ¶ h-i.

[10] ECF No. 37, Pretrial Order at ¶ j.

[11] ECF No. 37, Pretrial Order at ¶ c.

[12] 08/25/2021 Hearing at 10:00:21 a.m. to 10:02:37 a.m.

[13] Plaintiffs' Exhibit 12.

[14] 08/26/2021 Hearing at 10:53:57 a.m. to 10:55:09 a.m.

[15] 08/26/2021 Hearing at 10:56:03 a.m. to 10:58:02 a.m.

In his trial testimony, the Debtor disclosed his financial difficulties at the time he met Hawley. Although there were few specifics, the Debtor stated he had unpaid tax liabilities, debt on a commercial property lease, outstanding student loans, and loans to several individuals.[16] When the Debtor filed for bankruptcy in August 2018, he listed total debts of around $1 million, including Hawley's claim of $440,000, tax debt of $370,240, and mortgage debt of $137,939.[17]

### B.   The Parties' Initial Meeting

The first meeting between Hawley and the Debtor occurred in early September 2015 (the "Initial Meeting"). The meeting was arranged by Hawley's attorney Jonathan Miller ("Attorney Miller"). Attorney Miller knew that Hawley wanted to invest her inheritance in a business.[18] Attorney Miller also knew the Debtor as they were neighbors and fellow church members. Attorney Miller was familiar with the Debtor's various businesses. Attorney Miller arranged the meeting by contacting the Debtor and communicating Hawley's desire to invest in a business. Attorney Miller, the Debtor, Hawley, and Hawley's son Laith Hawley ("Laith") attended the Initial Meeting. Laith was there to assist his mother in vetting the Debtor.

### 1.   Testimony Regarding the Initial Meeting

The Debtor, Hawley, Laith, and Attorney Miller each testified as to what was said at the Initial Meeting. Their testimony was consistent as to the following facts:

(1) The purpose of the meeting was for Hawley to explore investment opportunities with the Debtor.

(2) Attorney Miller introduced the parties but was not in attendance for the entire meeting.

---

[16] 08/25/2021 Hearing at 10:59:10 a.m. to 11:01:00 a.m.

[17] Case No. 18-26080, ECF No. 2, Statement of Financial Affairs and Schedules.

[18] 08/25/2021 Hearing at 12:11:01 p.m.

(3) The participants discussed the Debtor's various businesses, including the Car Snobs used-car dealership and the Generic Resources hard-money lending business.

(4) Because of the risks associated with hard-money lending, Hawley did not want to invest in Generic Resources.

(5) Hawley was, however, interested in the Car Snobs used-car business.

(6) At the conclusion of the Initial Meeting, Hawley said she and Laith would think about lending money to Car Snobs and get back to the Debtor.

The conflicting points of the witnesses' testimony are summarized below.

(1) *Hawley's Testimony:* Hawley stated that at the Initial Meeting the Debtor understood and agreed that her loans would only be used to buy vehicles for resale, and that it was the Debtor's responsibility to clean and repair the cars for resale: "Buying and selling only, not repairing them."[19] As a slight variation, Hawley asserted that before she gave the Debtor the first $200,000, the Debtor agreed that the money would be "only spent on the purchase of cars."[20] Hawley further stated that during the Initial Meeting, the Debtor talked about having an ATV and a boat and that he lived in a large home in a desirable area of Bountiful, Utah.[21]

(2) *Laith's Testimony:* Laith's testimony was less specific. He stated that his mother "wanted to stick to just buying cars and getting paid her dividend when the cars sold."[22] He also said that the Debtor understood this condition and agreed to not use Hawley's money

---

[19] 08/25/2021 Hearing at 12:20:10 p.m. to 12:21:49 p.m.

[20] 08/25/2021 Hearing at 12:22:41 p.m. to 12:22:52 p.m.

[21] 08/25/2021 Hearing at 12:16:54 p.m. to 12:19:10 p.m.

[22] 08/25/2021 Hearing at 1:21:20 p.m. to 1:22:09 p.m.

for his other companies. However, Laith did not testify that the Debtor agreed to limit his use of the loans to only buying cars for resale.

(3) *Attorney Miller's Testimony:* Attorney Miller said that "the investment was to be used as a flooring line to purchase vehicles at an auction," and that the "money was to be used for that purpose to buy automobiles at auction."[23] He further stated that the Debtor agreed to these terms. However, Attorney Miller also disclosed that he introduced the parties, showed them around the office, and then "excused [him]self and left and the three of them talked, but I can't remember exactly."[24] Thus, Attorney Miller was not privy to all that was said during the Initial Meeting. Attorney Miller also disclosed that he knew both parties and had performed legal work for them. This puts Attorney Miller as the initiator of a failed business relationship between the parties that resulted in a significant loss to his client. Further, Attorney Miller acknowledged that he prepared the *post-factum* documentation for the investment, including a guaranty, two notes, and two security agreements.[25] Attorney Miller testified that the limitation on the use of Hawley's loans should have been in the note: "It's an oversight if that wasn't specifically included . . . ."[26] It appears that Attorney Miller was in the ethically precarious position of being Hawley's attorney but also counseling the Debtor, as evidenced by his subsequent testimony about his efforts to facilitate the Debtor's repayment of the loans, including acting as an intermediary between the two parties. Attorney Miller is not the objective, third-party

---

[23] 08/25/2021 Hearing at 1:38:51 p.m. to 1:39:22 p.m.

[24] 08/25/2021 Hearing at 1:38:40 p.m. to 1:38:51 p.m.

[25] See Plaintiffs' Exhibits 3-6.

[26] 08/25/2021 Hearing at 1:53:10 p.m. to 1:54:50 p.m.

witness the Court initially thought him to be. Thus, the Court gives less weight to his testimony about any agreements reached at the Initial Meeting.

(4) *The Debtor's Testimony:* The Debtor testified that there was a general understanding at the Initial Meeting that Hawley was interested in investing in the car dealership, and that she would think about it and contact the Debtor. But there were no specific agreements or limitations as to how Hawley's loans would be used. A few days later, Attorney Miller contacted the Debtor and said Hawley would make loans for use by the car dealership. At that time, Attorney Miller and the Debtor discussed the need to expand the dealership so it would generate sufficient revenue to repay Hawley. Together, they quickly found a larger lot that could hold 48 to 52 cars.

## 2.    Uncontested Facts Regarding the Initial Meeting

In addition to the testimony, the Stipulated Pretrial Order contains uncontested facts about what was represented and agreed to at the Initial Meeting. [27] The following uncontested facts are relevant:

(1) Before Hawley loaned the money, the Debtor represented that her "funds would only be used to expand and operate a particular used car dealership."[28]

(2) Hawley loaned the Debtor a total of $425,000.[29]

(3) The parties' agreed that the Debtor "would only use $25,000 of Plaintiffs' funds for office furniture, signage and a security system for the dealership" and that the

---

[27] ECF No. 37, Pretrial Order at ¶ 4.

[28] ECF No. 37, Pretrial Order at ¶ k(iv).

[29] ECF No. 37, Pretrial Order at ¶ m.

"remaining $400,000 was to be used exclusively to purchase vehicles for Debtor's car dealership."[30]

This chronology strongly suggests that the agreement to use Hawley's loans "exclusively to purchase vehicles for Debtor's car dealership" occurred after Hawley had already deposited the $425,000 into the Car Snobs' bank account. Further, the facts in the Pretrial Order do not include Hawley's asserted prohibition that her loans would not be used to repair and detail cars to enhance their resale value.

### 3.  Findings of Fact Regarding the Initial Meeting

While the Court questions the exactitude of the witnesses' recollections of conversations that occurred almost six years ago, the Court finds that the Debtor's version of the Initial Meeting and the subsequent events makes the most sense and is most consistent with: (1) the other versions of the parties' interactions, (2) the timing suggested in the Pretrial Order, and (3) what little documentary evidence exists of the parties' agreements.

Specifically, the Court finds that Attorney Miller arranged for Hawley and the Debtor to meet in early September 2015 to discuss a possible investment in the Debtor's business ventures. At the Initial Meeting, the Debtor explained his various businesses. Hawley expressed that she did not want to invest in the Generic Resources lending business, but she was interested in the Car Snobs business. A few days after the Initial Meeting, Hawley had Attorney Miller contact the Debtor to say she was interested in loaning money to expand the Car Snobs business and to purchase vehicle inventory for resale. A few days later, Hawley deposited the first loan of $200,000 in the Car Snobs' bank account. Unfortunately for Hawley, the specifics of the Debtor's

---

[30] ECF No. 37, Pretrial Order at ¶ n-o.

representations and any agreed restriction on the use of her money were not memorialized in the loan documents prepared by Attorney Miller.

As detailed above, the testimony and recollections of oral conversations from six years ago are unsurprisingly inconsistent and inconclusive. The Court cannot conclude that one witness was more credible than another and finds that each witness related their version of the Initial Meeting to the best of their perception at the time of the meeting and their memory as of the trial date. Based on the conflicting and inconclusive testimony, coupled with the absence of any contemporaneous documentation, the Court finds that while each party may have had different understandings of how Hawley's funds would be used, there was only a general, mutual understanding that Hawley would make loans to Car Snobs, and the Debtor would use the funds to expand the business by moving to a larger lot and acquiring a greater inventory of cars.

### C.    After the Initial Meeting

On September 9, 2015, Hawley deposited $200,000 into the Car Snobs bank account. On October 6, 2015, Hawley deposited an additional $225,000 into the Car Snobs bank account. The parties had agreed that $25,000 of this second loan would be used to buy signage, furniture, and equipment for the expanded car lot, and that the remaining $200,000 would be used to purchase car inventory. The Debtor acknowledged Hawley's deposits as loans he was to repay from the operation of the car lot.

As stated above, Hawley's loans were poorly documented. The Debtor, but not Hawley, signed an undated note that references a $250,000 "Revolving Line of Credit" with a beginning payment date of November 5, 2015 (the "First Note").[31] However, the First Note does not reflect the correct amount of the first loan (i.e., $250,000 versus $200,000), and it refers to the transaction

---

[31] Plaintiffs' Exhibit 6.

as a line of credit when in fact Hawley transferred the $200,000 loan as a lump sum. Further, the accompanying security agreement bears a date of December 2015 and purports to create a security interest in all of Car Snobs' assets, including the used-car inventory.[32] The May 2016 security agreement likewise provides for a security interest in all of Car Snobs' assets.[33] However, nothing was ever done to perfect such security interest. There is also a guaranty and a $425,000 note, but they were not signed by the Debtor until May 2016.[34] And there is the curiosity of a May 2016 security agreement that deals with a $425,000 loan but is in favor of M3 Consulting LLC ("M3"), an entity belonging to Attorney Miller.[35] Attorney Miller explained that this was done to facilitate the collection of Hawley's loan, but the nature of that help was not fully explained. The Debtor testified that he later made payments directly to M3, and the Debtor's accounting shows payments being made to M3 from May 2016 through March 2017 totaling $22,500.[36] The Court perceives there is more to Attorney Miller's involvement in this deal than came out at trial, but it appears he was a third party to this transaction from the beginning to the end.

Prior to receiving Hawley's first loan on September 9, 2015, the balance of the Car Snobs' checking account was $0 and was overdrawn.[37] The combined balance in the Debtor's personal bank account was about $40.[38] The Car Snobs' bank statement shows that within a few weeks of receiving the total loan proceeds of $425,000, the Debtor transferred $126,378 out of the Car Snobs' account to the following:[39]

---

[32] Id. at p. 3, ¶ 2.

[33] Plaintiffs' Exhibit 5 at ¶ 2.

[34] Plaintiffs' Exhibits 3 and 4.

[35] Plaintiffs' Exhibit 5.

[36] Defendant's Exhibit B.

[37] Plaintiffs' Exhibit 10, Bates No. HAWLEY 1335.

[38] Plaintiffs' Exhibit 7, Bates No. HAWLEY 0049-0050.

[39] Plaintiffs' Exhibit 10, Bates No. HAWLEY 1334-1347.

1. Generic Resources: $65,000

2. Polished Image: $22,231

3. Debtor personally: $20,451

4. Cash: $16, 606

5. His & Hers: $ 2,000

While it seems the Debtor did not keep complete records of his disposition of Hawley's loans, neither was there any evidence that Hawley and Attorney Miller requested such an accounting—at least not until many months later when it appeared the business was failing. However, the bank statements and expert report show that by August 2016, when the dealership closed, the Debtor had spent over $484,500 on car inventory, which is greater than Hawley's loans of $425,000.[40]

After the Initial Meeting, the Debtor and Attorney Miller began looking for a larger car lot. By October 1, 2015, they had procured a lot at 575 South 500 West, Bountiful, Utah, and began selling cars under the name "Accelerated Car Sales" because Hawley thought the Car Snobs name was "too elitist." From December 2015 through August 2016, the car lot operated, and the Debtor made monthly payments to Hawley in the average amount of $2,756.[41] The Car Snobs business shut down in August of 2016. In March 2017, the Debtor made a final, lump sum payment of $12,000.[42] The total amount the Debtor repaid to Hawley was $34,500.[43]

Consequently, the Court finds that only at some point after Hawley made the loans, the Debtor agreed to only use her funds to purchase vehicle inventory. But again, the evidence does

---

[40] Plaintiffs' Exhibit 15, Export Report at 6.

[41] Defendant's Exhibit B. *See also* Plaintiffs' Exhibit 10, Bates No. HAWLEY 1354-1382 and Plaintiffs' Exhibit 15.

[42] Defendant's Exhibit B.

[43] Defendant's Exhibit B. *See also* Plaintiffs' Exhibit 10, Bates No. HAWLEY 1354-1382 and Plaintiffs' Exhibit 15.

not establish an express agreement by the Debtor to not use Hawley's loans to clean and repair cars for resale. And cleaning and repairing cars for resell to increase their value and thereby maximize profits seems an sensible and legitimate component of the used-car business.

### D.  The State Court Default Judgment

On December 8, 2017, Hawley filed a state court complaint in the Second District Court for the State of Utah against the Debtor and several of his businesses ("State Court Action").[44] The state court complaint asserted the following causes of action: (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3) fraud; (4) fraudulent misrepresentation; (5) civil conspiracy; (6) conversion; (7) fraudulent transfer; and (8) unjust enrichment.[45] After being served, the Debtor contacted Hawley, but he never formally responded to the complaint.[46] On April 5, 2018 Hawley obtained a default judgment for damages of $400,000 plus exemplary and punitive damages of $4,000,000 (the "Default Judgment").[47] On August 16, 2018, the Debtor filed this Chapter 7 case.[48] Hawley has not collected any funds from the Debtor under the Default Judgment.[49]

## IV.  CONCLUSIONS OF LAW & ANALYSIS

### A.  Collateral Estoppel and the *Rooker-Feldman* Doctrine

Although the Pretrial Order does not mention collateral estoppel, and Hawley's counsel did not argue it at trial, a large portion of Hawley's trial brief[50] focuses on the alleged collateral

---

[44] ECF No. 37, Pretrial Order at ¶ r.

[45] Plaintiffs' Exhibit 1.

[46] ECF No. 37, Pretrial Order at ¶ t.

[47] Plaintiff's Exhibit 2.

[48] Case No. 18-26080.

[49] ECF No. 37, Pretrial Order at ¶ aa.

[50] ECF No. 41.

estoppel effect of the Default Judgment. The trial brief contends that Hawley is entitled to a

nondischargeable judgment of $4,400,000 under §§ 523(a)(2)(A) and (a)(6) because the principles

of collateral estoppel bar the Debtor from "avoiding the effects of the state court judgment." In

addition, Hawley argues the *Rooker-Feldman* doctrine requires this Court to "recognize the final

orders from state courts."[51] The Court will address the issues of collateral estoppel and *Rooker-*

*Feldman* before delving into the analysis of the §§ 523(a)(2)(A) and (a)(6) causes of action.

Collateral estoppel or issue preclusion provides that "once a court has decided an issue of

fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit

on a different cause of action involving a party to the first case."[52] Collateral estoppel is an

available argument in the determination of dischargeability under § 523(a).[53] The bankruptcy court

is "to look to the preclusion law of the state in which the judgment was rendered."[54] In this case,

the Default Judgment was issued by a Utah state court.

In Utah, "[i]ssue preclusion, often referred to as collateral estoppel, prevents relitigation of

issues already determined in a previous action."[55] Collateral estoppel provides that "once a party

has had his or her day in court and lost, he or she does not get a second chance to prevail on the

same issues."[56]

A party seeking to invoke collateral estoppel must establish that: (1) the issue
decided in the prior adjudication is identical to the one presented in the instant
action; (2) the party against whom issue preclusion is asserted was a party, or in

---

[51] ECF No. 41.

[52] *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1520 (10th Cir. 1990) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

[53] *Grogan v. Garner*, 498 U.S. 279, 284-85 n. 11 (1991); *Hill v. Putvin (In re Putvin)*, 332 B.R. 619 (10th Cir. B.A.P. 2005) ("In bankruptcy court the collateral estoppel doctrine may apply in determining the dischargeability of a debt.") (citations omitted).

[54] *In re Putvin*, 332 B.R. at 625.

[55] *Collins v. Sandy City Bd. Of Adjustment*, 16 P.3d 1251, 1253 (Utah Ct. App. 2000).

[56] *Buckner v. Kennard*, 99 P.3d 842, 846–47 (Utah 2004) (citing *Berry v. Berry*, 738 P.2d 246, 249 (Utah Ct. App. 1987)).

privity with a party, to the prior adjudication; (3) the issue in the first action was completely, fully, and fairly litigated; and (4) the first suit resulted in a final judgment on the merits.[57]

At issue in this proceeding is whether the Default Judgment was completely, fully, and fairly litigated. Unfortunately, Utah's precedent on whether a default has been "actually litigated" is unclear.[58] Hawley cites to *Naylor v. Ellsworth*,[59] to argue that a default judgment has preclusive effect for purposes of collateral estoppel. But the facts of *Ellsworth* are distinguishable in that the default judgment was entered as a sanction for the debtor's obstructive conduct.[60] Moreover, the debtor in *Ellsworth* initiated the complaint to annul his marriage.[61] In contrast, the Debtor in this case simply failed to respond or participate in Hawley's State Court Action. Simply put, the policy considerations for applying preclusive effect to a default judgment resulting from obstructive conduct are not present.

In the absence of a bright-line rule that a default judgment entered without a party's participation has preclusive effect in Utah, the Court will not deviate from the general rule that "[i]n the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated."[62] Thus, the Court declines to give the Default Judgment preclusive effect.

Hawley's Pretrial Brief goes on to state that *Rooker-Feldman* is an additional reason to rule in her favor. The *Rooker-Feldman* doctrine applies "to cases of the kind . . . brought by state-court

---

[57] *Id.* at 847.

[58] *Jenkins v. Prime Ins. Co.*, No. 21-00130-DAK, 2021 U.S. Dist. LEXIS 159256, at *11 (D. Utah Aug. 23, 2021) ("Utah law is not clear on what constitutes 'actually litigated.' In fact, the clearest pronouncement of the meaning of this phrase presents conflicting definitions.").

[59] *Naylor v. Ellsworth (In re Ellsworth)*, No. 12-27213, 2014 WL 172414, 2014 Bankr. LEXIS 145 (Bankr. D. Utah Jan. 12, 2014).

[60] *Id.* at *4, *13 (noting the debtor "ignored discovery requests, disobeyed the order of the State Court compelling attendance at his deposition, and failed to appear at set hearings.").

[61] *Id.* at *4, *12.

[62] RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982).

losers complaining of injuries caused by state-court judgments rendered before the [federal] court proceedings commenced and inviting the [federal] court review and rejection of those judgments."[63] However, the *Rooker-Feldman* doctrine does not apply in this situation. The Debtor is not asking this Court to review the State Court Judgment or to reject its findings as to the amount of his liability. Therefore, the Court will not apply the *Rooker-Feldman* doctrine to this proceeding.

### B.     Section 523(a)(2)(A) — False Pretenses, False Representation, or Actual Fraud

Hawley seeks a determination of nondischargeability under § 523(a)(2)(A) for false pretenses, false representation, or actual fraud, and/or under § 523(a)(6) for willful and malicious injury.[64] "Exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."[65] Hawley has the burden to prove the elements of nondischargeability under § 523 by a preponderance of the evidence.[66]

Under § 523(a)(2)(A), the discharge of a debt can be based on false pretenses, a false representation, or actual fraud.[67] Any one of these alone can be the basis for a finding of nondischargeability.[68] While Hawley's evidence focused on false representation, the Complaint[69]

---

[63] *Exxon Mobile Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005).

[64] Hawley did not plead a cause of action under § 523(a)(2)(B). Thus, any alleged fraud involving a statement by the Debtor regarding his financial condition cannot be a basis for a denial of discharge. Specifically, any statements or omissions by the Debtor about the income, assets, debts or financial success of himself or his businesses are not relevant to Hawley's action under § 523(a)(2)(A). *In re May*, 579 B.R. 568, 582 (Bankr. D. Utah 2017) ("[§ 523(a)(2)(A)] expressly does not apply to statements respecting a debtor's or an insider's financial condition.").

[65] *Affordable Bail Bonds, Inc. v. Sandoval*, 541 F.3d 997, 1001 (10th Cir. 2008) (quoting *Bellco First Fed. Credit Union v. Kaspar*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

[66] *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

[67] "A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

[68] *In re May*, 579 B.R. 568, 581 (Bankr. D. Utah 2017) (citing *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 691 (B.A.P. 10th Cir. 2013)); *In re Sturgeon*, 496 B.R. 215, 223 (B.A.P. 10th Cir. 2013).

[69] ECF No. 1.

references all three types of fraud under § 523(a)(2)(A), so the Court will examine the evidence in the contexts of false representations, false pretenses, and actual fraud.

      1.    <u>False Representation</u>

A § 523(a)(2)(A) claim for false representations requires the following elements: "(1) the debtor made a false representation, (2) the debtor made the representation with the intent to deceive the creditor; (3) the credit relied on the debtor's representation; (4) the creditor's reliance was justifiable; and (5) the creditor was damaged as a proximate result."[70] "Intent to deceive may be inferred from a totality of the circumstances,"[71] but establishing such intent is the most challenging evidentiary hurdle in prevailing under § 523(a)(2)(A). Further, the intent must exist at the time of the loan, not after:

> For a debt to be nondischargeable under § 523(a)(2)(A), there has to be more than just a loan that has gone unpaid. There has to be "false pretenses, a false representation, or actual fraud" in the *making* of the loan, not in acts subsequent to that time.[72]

      *a.*    *The Debtor's Representation.*

Hawley alleges that at the Initial Meeting the Debtor agreed to use her money to buy used cars for resale at the dealership and for no other purpose, including the cleaning, detailing, or repairing of cars for resale. Hawley also alleges that she would not have lent the money to the Debtor if he had not first agreed to this limitation. Hawley then alleges that the Debtor agreed to this condition with the intent to deceive in that the Debtor knew at the time of this representation that he would use Hawley's funds for other purposes. This is the gravamen of Hawley's complaint.

---

[70] *Pino v. Jensen (In re Jensen)*, No. 17-01078, 2019 Bankr. LEXIS 1774, at *10 (10th Cir. June 7, 2019).

[71] *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 922 (B.A.P. 10th Cir. 2010) (citing *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996)).

[72] *Mote v. Giles (In re Giles)*, No. 20-5005, 2020 Bankr. LEXIS 2994, at *14 (Bankr. D. Kan. Oct. 13, 2020) (emphasis in original).

But as explained above, based on the conflicting testimony and the absence of documentation, the Court cannot find that the Debtor expressly represented at the Initial Meeting that he would only use Hawley's loans to purchase car inventory. Further, the absence of a written agreement limiting the Debtor's use of the loans suggests this was not the critical condition precedent to Hawley making the loans, as she now asserts. This situation exemplifies the age-old adage of "get it in writing." If the parties had contemporaneously memorialized the Debtor's representations and Hawley's restrictions, it could have been conclusive as to these points. At best, the evidence only establishes a generally understood agreement that the Debtor would use Hawley's loans to "expand and operate" the Car Snobs dealership, including the acquisition of a larger inventory of vehicles.

### b.     *Hawley's Justifiable Reliance.*

But even if the Debtor had represented that he would only use Hawley's loans to purchase inventory for the dealership, Hawley has not satisfied the element of justifiable reliance. As explained by the Tenth Circuit:

> The fourth element of the § 523(a)(2)(A) test requires the creditor's reliance to be "reasonable." The appropriate standard is not "reasonableness" in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the inquiry is whether the actual creditor's reliance was "justifiable" from a subjective standpoint. In determining whether a creditor's reliance was justifiable, a court should therefore examine "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than applying a community standard of conduct to all cases." Even under the "justifiable" test, however, the plaintiff must "use his senses" and at least make "a cursory examination or investigation" of the facts of the transaction before entering into it. Moreover, this test "does not leave objective reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits

of the objectively reasonable, the greater the doubt about reliance in fact." In effect, "reasonableness goes to the probability of actual reliance."[73]

Hawley's reliance appears to be primarily based on Attorney Miller's recommendation and advice. There is no evidence that Hawley or Attorney Miller independently conducted any reasonable due diligence before deciding to make the loans, in documenting the loans, or in monitoring the Debtor's use of the loans. Indeed, Hawley made the first $200,000 loan within days of the Initial Meeting, and then she made another loan of $225,000 a month later on October 6, 2015, which is before Attorney Miller prepared any documentation for the loan.

While the standard for a false representation is one of subjectively justifiable reliance, that standard cannot be so low as to mean that in lending $425,000, a party does not need to make some attempt at due diligence in verifying the borrower's representations, memorializing the representations, and monitoring compliance with the representations. In this case, Hawley simply loaned $425,000 to the Debtor on nothing more than an oral discussion and understanding at a single meeting. Perhaps Hawley relied too much on Attorney Miller to protect her interests. But even so, that does not excuse Hawley's own failure to engage in even a minimal degree of due diligence to ensure that her condition to limit the Debtor's use of her loans and the Debtor's compliance with that limitation were clarified and verified. Based on the timing and amount of Hawley's loans, coupled with the absence of due diligence or the imposition of reasonable checks and balances on how the Debtor spent the loans, the Court concludes that Hawley's reliance on any representation made by the Debtor was not subjectively justifiable.

The absence of subjectively justifiable reliance is sufficient alone to deny Hawley's claim under § 523(a)(2)(A) for false representation. But as detailed more fully below, the Court also finds

---

[73] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 792 (10th Cir. 2009) (quoting *Field v. Mans*, 516 U.S. 59, 74–75 (1995)).

insufficient evidence to conclude that the Debtor acted with the requisite intent to deceive Hawley. Therefore, the Court concludes that Hawley did not establish by a preponderance of the evidence a claim for nondischargeability based on a false representation.

2.    False Pretenses

"False pretenses under Section 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions."[74] False pretenses can be "defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."[75]

While Hawley pleaded false pretenses as a cause of action, most of the trial focused on the Debtor's alleged false representation that he would only use Hawley's funds to buy car inventory. While Hawley testified that the Debtor made implied representations that he drove a Ford F150, had an ATV, owned a boat, and lived in a nice house, those representations were admitted for the limited purpose of whether Hawley's reliance on the Debtor's statements were justifiable. Statements regarding the Debtor's written statements of financial condition would only be actionable under § 523(a)(2)(B), which was not pleaded. Other than Hawley's statements about what the Debtor said at the Initial Meeting about his assets, the Court did not hear other testimony that could constitute false pretenses. And as explained below, the Court finds that the Debtor lacked the intent required for false pretenses. Therefore, the Court concludes that Hawley did not establish by a preponderance of the evidence a claim for nondischargeability based on false pretenses.

---

[74] *Bank of Cordell v. Sturgeon* (*In re Sturgeon*), 496 B.R. 215, 223 (B.A.P. 10th Cir. 2013).

[75] *Id.* (citations and quotations omitted).

3.      Actual Fraud

"Actual fraud occurs when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right."[76] To except a debt from discharge for actual fraud, the plaintiff must prove: "(1) fraudulent intent; (2) a fraudulent scheme; and (3) injury caused by the scheme."[77] The Supreme Court defined "actual fraud" in *Husky Int'l Elecs., Inc. v. Ritz*:

> "Actual fraud" has two parts: actual and fraud. The word "actual" . . . denotes any fraud that "involves moral turpitude or intentional wrong." "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."[78]

Further, "[a]ctual fraud consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."[79]

However, as set forth in the next section, the Court finds that the Debtor lacked the necessary wrongful or fraudulent intent to deceive or cheat Hawley at the time she made the loans. Therefore, the Court concludes that Hawley did not establish by a preponderance of the evidence a claim for nondischargeability based on actual fraud.

4.      Fraudulent Intent

The most critical, as well as most difficult, element in an action for false pretenses, false representation, or actual fraud under § 523(a)(2)(A) is establishing by a preponderance of the evidence that the debtor acted with the intent to defraud or deceive.

---

[76] *In re Giles*, 2020 Bankr. LEXIS 2994, at *11 (citations omitted)

[77] *In re Jensen*, AP 17-01078, 2019 WL 2403105, at *8 (B.A.P. 10th Cir June 7, 2019) (quoting *Cherry v. Neuschafer (In re Neuschafer)*, Nos. KS-13-030, KS-13-035, 2014 WL 2611258, at *5 (10th Cir. BAP June 12, 2014)).

[78] *Husky Int'l Elecs., Inc. v. Ritz*, 578 US. 356, 360 (2016) (citations omitted).

[79] 4 COLLIER ON BANKRUPTCY P 523.08 (16th 2021).

> The [plaintiffs] have a difficult task from the beginning on an actual fraud claim, as they must show Debtor's fraudulent intent. A debtor's intent to deceive may be inferred from the totality of the circumstances. The bankruptcy court must consider whether the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor. A totality of the circumstances inquiry is fact specific and hinges on the credibility of witnesses.[80]

Further, the "touchstone to a finding of intent to deceive is the speaker's actual subjective state of mind—*i.e.*, the speaker's actual knowledge and belief—at the time the misrepresentation is made."[81]

Thus, the dispositive element of this proceeding is whether at the time of the loans, the Debtor made representations to Hawley with an actual, subjective, and concurrent intent to deceive, cheat, or defraud Hawley. The Court has already found that at best, the Debtor represented he would use the loans to "expand and operate" the Car Snobs dealership. Nonetheless, this representation could still be fraudulent if the facts establish it was made with an intent to deceive. Hawley contends that the Debtor's intent to deceive can be inferred by the totality of the circumstances, including: (1) the Debtor's financial difficulties at the time of the loans; and (2) the Debtor's transfer of the loan proceeds to other entities in proximity to their receipt.

The documents admitted into evidence, consisting primarily of financial information and the deficient, *post-factum* documentation, do not reveal an intent to deceive. On cross examination, the Debtor's testimony and explanation of his actions likewise did not evince an intent to deceive. Indeed, the Court found the Debtor's statements to be generally credible and forthcoming, including admissions about his debts at the time of the Initial Meeting and his transfers of the loan proceeds among various accounts. The Debtor also provided reasonable explanations as to his use

---

[80] *In re Giles*, 2020 Bankr. LEXIS 2994, at *12  (citations and internal quotes omitted).

[81] *DCS Nat'l Props. LLC v. Johnson (In re Johnson),* 477 B.R. 156, 170 (B.A.P. 10th 2012).

of the funds and why the car dealership ultimately failed. While debtors seldom admit to such intent, there is often an inconsistent statement, an unlikely narrative, or an implausible explanation in a debtor's testimony that at least opens the door to this possibility. Perhaps with a more aggressive cross examination as to the Debtor's use of the loan proceeds or why the business failed, such would have come to light. But as it is, the Court did not perceive any fraudulent intent from the Debtor's uttered testimony. Therefore, the Court turns to the circumstantial evidence of fraudulent intent.

The Court finds that the following facts dissuade from a determination of fraudulent intent. First, it was Attorney Miller, Hawley's counselor and advisor, who introduced the parties and approached the Debtor on Hawley's behalf. While the Debtor was interested in doing the loan when Attorney Miller approached him, he did not initiate the contact with Hawley. This fact is generally inconsistent with a scheme to defraud where the perpetrator usually solicits and persuades the victim to deliver up the cash.

Second, the Debtor did not abscond with the money. Instead, the evidence shows that the Debtor bought and sold over $500,000 in cars from September 2015 through August 2016. And there is no evidence suggesting that the Debtor was not working full time to make the car business profitable. This conclusion is supported by the following facts:

1.      From September 2015 through August 2016, the Debtor had spent $484,522.67 in purchasing car inventory.[82]

2.      From September 2015 through August 2016, Car Snobs sold approximately 50 vehicles generating gross revenues of $554,605, or an average of $11,092 per car.[83]

---

[82] Exhibit 15, Expert Witness Report at 6.

[83] *Id*. at 46.

3. From September 2015 through August 2016, Car Snobs received a total of $928,298 in income from all sources.[84] Thus, excluding Hawley's loan proceeds of $425,000, Car Snobs generated gross revenues of $503,298.

Therefore, the Court finds it inconsistent with a fraudulent intent that (1) the Debtor worked for almost a year to make Car Snobs successful; (2) the Debtor used amounts in excess of Hawley's loans to purchase car inventory; and (3) excluding Hawley's loans, the business grossed over $500,000. These facts evidence only a failed business rather than a fraud.

Third, the Debtor's financial records and testimony do not reveal any attempt to conceal his expenditure of Hawley's funds, including the transfers to other accounts. At any time, Hawley or Attorney Miller could have reviewed and discovered these transfers or otherwise monitored the Debtor's expenditures. That the Debtor did not attempt to conceal his use of the loaned funds again suggests an absence of fraud.

Fourth, from December 2015 through August 2016, the Debtor made monthly payments to Hawley in the average amount of $2,756, resulting in total payments of $34,500.[85] This exceeds the minimum monthly payment of $2,250 required by the May 18, 2016 note.[86] The Car Snobs business shut down in August 2016. In March 2017, the Debtor made a final lump sum payment to Hawley of $12,000.[87] That the Debtor made regular payments to Hawley, and made an additional payment well after the business closed, again suggests that this is a case of an unpaid loan resulting from an unsuccessful business venture rather than a fraud by the Debtor.

---

[84] *Id.* at 16.

[85] Defendant's Exhibit B.

[86] Plaintiffs' Exhibit 4 at ¶ 3.

[87] Defendant's Exhibit B.

Nonetheless, at the time of the time of Hawley's loans, the Debtor had outstanding liabilities. Specifically, the balance in the Debtor's personal account was less than $40, the balance in the Car Snobs' account was overdrawn, and the Debtor had significant tax debts. But the evidence and testimony established that Car Snobs had generally been profitable, and there was no evidence that either before or after the loans that Car Snobs was a sham or fraudulent business. On the contrary, the evidence was that the Debtor, Hawley, and Attorney Miller knew that Car Snobs business needed to expand to generate greater profits for the benefit of both parties. Indeed, the expansion of the business was the parties' motivation for entering into a borrower/lender relationship. And the evidence establishes that the Debtor spent significant funds on expanding the car business and purchasing additional inventory. Thus, the Court finds that the existence of outstanding debts, standing alone, does not establish a fraudulent intent when the Debtor used the loans to expand and operate the Car Snobs business.

The most problematic fact is that after receiving Hawley's loans, the Debtor transferred $126,379 to his other business accounts, including $20,000 to himself.[88] Further, the Debtor "promised" that none of Hawley's funds would be used for personal expenses.[89] The Debtor testified that his practice was to move funds between his accounts interchangeably where funds were needed, including funds going back into Car Snobs. Indeed, Hawley's expert report shows unknown deposits into the Car Snobs' account of just under $209,000, suggesting that funds other than from the sale of cars flowed back to Car Snobs.[90] While the Debtor's commingling of funds is a poor business practice, and something that should have been examined and considered as part of Hawley's and Attorney Miller's due diligence, the car dealership continued to operate

---

[88] Plaintiffs' Exhibit 15, Expert Witness Report at 20.

[89] ECF No. 37, Pretrial Order at ¶4(k)(vi).

[90] Plaintiff's Exhibit 15 at 16.

unimpeded after these transfers. Indeed, the Debtor expended over $484,500 in purchasing car inventory for Car Snobs, which exceeds the amount of Hawley's loans. In addition, there was no specific evidence as to how the Debtor used the funds he withdrew from the Car Snobs' account. While the Debtor's transfer of funds to other accounts and himself suggests an improper use, that fact, without more, does not establish fraud or an intent to deceive.

In summary, it is Hawley's burden to establish that before she made the loans, the Debtor made representations to her with the intent to deceive. The evidence elicited at trial did not establish that the Debtor made the specific representation that he would only use Hawley's loans to purchase car inventory and not to clean and repair the cars. And most significantly, the evidence failed to establish that the Debtor made any representation to Hawley with the mandatory fraudulent intent. The Court acknowledges that this is often a difficult standard for injured plaintiffs to meet. But it is consistent with the Bankruptcy Code's presumption that a debtor is entitled to a discharge, and it is the standard required by the law. Therefore, for the reasons set forth above, the Court concludes that Hawley did not establish by a preponderance of the evidence a claim for nondischargeability under § 523(a)(2)(A) based on false representation, false pretenses, or actual fraud.

### C. Section 523(a)(6) — Willful and Malicious Injury.

Section 523(a)(6) excepts from discharge a debt arising from the "willful and malicious injury by the debtor to another entity or to the property of another entity." The purpose of this section is to preclude the discharge of claims arising from a debtor's tortious conduct that resulted in harm to persons or property.[91] "For an injury to be 'willful,' there must be a deliberate or

---

[91] 4 COLLIER ON BANKRUPTCY P 523.12[1] (16th ed. 2021) ("Section 523(a)(6) generally relates to torts and not to contracts. By its terms, it may apply to a broad range of conduct causing harm to people or property, subject to the limitation that the injury be 'willful and malicious.'").

intentional injury, not merely 'a deliberate or intentional act that leads to injury.'"[92] "A willful injury may be established by direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or by indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur."[93] In other words "to constitute a willful act under § 523(a)(6), the debtor must desire to cause the consequences of his act or believe that the consequences are substantially certain to result from it."[94] As to the "malicious" element, the Tenth Circuit Bankruptcy Appellate Panel has held that:

> For an injury to be "malicious," evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite 'malice' in addition to 'willfulness' is present. [A]ll the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind vis-a-vis the actual injury caused the creditor.
> ...
> [T]he malicious element [requires] an act taken in conscious disregard of one's duties and without just cause or excuse, even in the absence of personal hatred, spite or ill-will, or wrongful and without just cause or excuse.[95]

Applying this view of willful and malicious injury, the Court has considered the totality of circumstances and finds that Hawley has not established by a preponderance of the evidence that the Debtor's conduct was willful and malicious. The evidence shows that the Debtor worked for almost a year to make the dealership successful by leasing a bigger lot, purchasing car inventory at auction, and rehabbing cars for resale. But the expansion of the Car Snobs dealership simply did not scale up in profitability as expected by the Debtor, Attorney Miller, and Hawley, which eventually led to the dealership's demise. The failure of the business and loss of Hawley's loaned

---

[92] *In re Judge*, 630 B.R. 338, 344 (B.A.P. 10th Cir. 2021) (citing *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912 (B.A.P. 10th Cir. 2020)).

[93] *In re Smith*, 618 B.R. at 912.

[94] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)).

[95] *In re Smith*, 618 B.R. at 919 (internal citations and quotation marks omitted).

funds cannot be attributed to a deliberate or intentional injury by the Debtor. Therefore, Hawley's claim for relief under § 523(a)(6) must likewise be denied.

## V.        CONCLUSION

The Court is sympathetic to Ms. Hawley and the loss of her retirement funds, especially given that she was introduced to the Debtor by her attorney and ostensibly relied on him to protect her interests. Unfortunately, the trial failed to establish the following by a preponderance of the evidence: (1) prior to the loan, the Debtor represented that he would only use Hawley's loans to buy car inventory; (2) prior to the loan, the Debtor made this or other representations with a fraudulent, deceptive, or malicious intent as to Hawley; and (3) as to the false representation claim, that Hawley justifiably relied on the Debtor's representations.

What the case did present was that Hawley and Attorney Miller did not exercise even minimal due diligence or oversight, and that the Car Snobs business enterprise expended significant funds to expand but then was unable to realize a commensurate profit to the point of failure. A failed business resulting in an unpaid loan is not *per se* the result of fraud.

Based on the foregoing, the Court finds that the Hawley did not carry their burden of proof by a preponderance of the evidence that the debt owed by the Debtor should be nondischargeable under §§ 523(a)(2)(A) or (a)(6). The Court will issue an order simultaneously with this Memorandum Decision.

————ooo0ooo————

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing Memorandum Decision shall be on the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

- Jeffrey H. Hagen jhagenwbh@gmail.com, jhhagenlaw@gmail.com;hagenjr72710@notify.bestcase.com
- Kurt W Laird kurt@andersonhinkins.com, ecf@andersonhinkins.com
- David R. Williams david@pearsonbutler.com, sasha@pearsonbutler.com


**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).


None.